UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

In re:  }
        }
MATTHEW R. HICKS and   } Case No. 10-41855-JJR-13
HOLLI B. HICKS,        }
        }
           Debtors.    }
_____

## MEMORANDUM OPINION

This case was originally filed on June 30, 2010 under Chapter 7 of the Bankruptcy Code.[1] The Bankruptcy Administrator ("BA") filed a Statement of Presumed Abuse (Doc. 21), and pursuant to §§ 707(a) and (b), and Rule 1017(e) of the Federal Rules of Bankruptcy Procedure, the BA filed a Motion to Dismiss or in the Alternative Convert Case to One Under Chapter 13 With Debtors' Consent (Doc. 26). The Debtors conceded and filed a Motion to Convert their case from Chapter 7 to Chapter 13 (Doc. 40), which was granted (Doc. 47).

After being continued four times, a final hearing was held on confirmation of the Debtors' amended plan (Doc. 65 and herein the "Plan"). The Trustee filed an Objection to Confirmation of the Plan and Motion to Dismiss (Doc. 91 and herein, the "Trustee's Motion"). The Trustee's Motion alleged the following grounds for denial of confirmation and dismissal:

1. Pursuant to 11 U.S. § 1325(b)(1), the debtors are not offering all their disposable income in that the debtors have excess income on their Statement of Current Monthly income that may need to be offered to unsecured claimholders (19%). Debtors budget is excessive. Debtors are retaining unnecessary items (motorcycle).

---

[1] 11 U.S.C. § 101 *et seq*, and referred to as the "Code" or "Bankruptcy Code." Citations to sections, subsections and other subdivisions of the Code are preceded by the symbol "§."

2. Pursuant to 11 U.S.C. § 1325(a)(3), the plan is not proposed in good faith.

3. Adequate protection payments have not been provided to be paid by the Trustee, nor has proof been provided that the payments have been made directly.

4. Pursuant to 11 U.S.C. § 1322(a), the offer of payment is insufficient to accomplish what is proposed. If the percent to unsecured [sic] is increased to 19%, the amount needed is $1,036.00 per month.

For the reasons stated below, the Court has concluded that the Trustee's Motion is due to be granted: The Plan should not be confirmed and the Debtors' case is due to be dismissed.

Through their Plan, the Debtors offered to pay $1,000 monthly to the Trustee, for a total of $60,000 over the Plan's 60-month commitment period. From Plan payments, the Trustee was to pay three secured creditors, and approximately 10% of unsecured claims. The three secured creditors were Harley Davidson, whose $9,226.10 claim was secured by a motorcycle; HSBC, whose $1,015.65 claim was secured by a 40" TV; and Regions Bank, whose $11,700.00 claim was secured by a Cadillac automobile.[2] Although each of the three secured claims was secured by a purchase money security interest, no adequate protection payments pending confirmation were provided for in the Plan, or otherwise, as required by § 1326(a)(1(C).[3]

---

[2] The secured claims of Harley Davidson and HSBC were protected by the "hanging" paragraph at the end of § 1325(a), and could not, therefore, be bifurcated; however, Region's secured claim was not so protected, and after a valuation hearing, Regions was allowed a secured claim of $11,700 and an unsecured claim of $5,268.98. (Doc. 81).

[3] The Plan delayed commencement of monthly installments to holders of secured claims until administrative expenses (including attorney's fees) were paid. Although not challenged by the Trustee, delaying payments on secured claims in deference to administrative claims appears to be contrary to § 1325(a)(5)(B)(iii)(I), which requires that "periodic payments [on secured claims] . . . shall be in *equal* monthly amounts." *Wells Fargo Financial Georgia, Inc. v. Baxter (In re Williams)*, 385 B.R. 468, 473 (Bankr. S.D. Ga. 2008) (emphasis added). *See also In re Dispirito*, 371 B.R. 695, 700 - 01 (Bankr. D.N.J. 2007) (adequate protection payments must be

After their case was converted to Chapter 13, the Debtors filed the mandatory Official Form 22C – Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income (Doc. 87 and herein "Form 22C"). On lines 20 and 53 of Form 22C the Debtors reported current monthly income ("CMI") of $9,343.67, and annualized CMI on lines 15 and 21 of $112,124.04.[4] After subtracting expenses and deductions the Debtor's reported $521.92 as their monthly disposable income on line 59. The Debtors also reported their CMI on Schedule I (Doc. 43 p.14) and their expenses on Schedule J (Doc. 43 p.15 and herein, the "Original Schedule J"), which was later amended (Doc. 92 and herein, the "Amended Schedule J").

The expenses reported on both Schedules J were excessive. Specifically, the Debtors deduct $215.00 per month for a security alarm and cable (line 2d). This deduction amounts to $2,580 per year, or $12,900 over the life of the Plan. Expenses for a security alarm and cable are not reasonably necessary for the adjustment and reorganization of the Debtors' debts under Chapter 13, for their performance of the Plan, or the maintenance and support of the Debtors or their dependents. On line 13d of the Original Schedule J, the Debtors deducted $550 for "School lunches/supplies/fees." During an earlier confirmation hearing, Debtors' counsel proffered that these expenses were gratuitous payments made by the Debtors, both school teachers, for students in their classes. No other proof was offered to support that these gratuities were actually being paid, and the credibility of the proffered explanation became suspect after the Debtors filed their Amended Schedule J.

The only change on Amended Schedule J was to itemize the expenses in part 13. On lines

---

paid ahead of attorney's fees and other administrative expenses).

[4]The Debtors' annualized CMI exceeded the applicable median for a family their size, thus the Plan's commitment period was required to be 60 months, which it was. § 1325(a)(4)(A).

3

13 a, b and c the Debtors claimed, respectively: field trips/softball games - $150; complete uniforms for 3 - $200; and lab, project fees, lunches - $200 (totaling $550 per month on line 13d). Counsel proffered at the final confirmation hearing that these itemized expenses in part 13 of Amended Schedule J were now claimed for the Debtors' three dependent children, not for students in their classes as originally represented. There is a similar proof and credibility problem with respect to the same expenses deducted on part 43 of the Debtors' Form 22C.

Part 43 of Form 22C allows a deduction of up to $147.92 per month for education expenses for each dependent child under 18. The Debtors have three children under age 18 and they deducted $440, essentially the maximum allowed for three children. The problem lies with the requirement highlighted in part 43 for taking this deduction: "YOU MUST PROVIDE YOUR CASE TRUSTEE WITH DOCUMENTATION OF YOUR ACTUAL EXPENSES, AND YOU MUST EXPLAIN WHY THE AMOUNT CLAIMED IS REASONABLE AND NECESSARY AND NOT ALREADY ACCOUNTED FOR IN THE IRS STANDARDS." Supporting documentation and an explanation for these deductions are also required by § 707(b)(2)(A)(ii)(IV); however, no such documentation or explanation was provided to the Trustee.

If the expenses deducted on lines 13 a, b and c of Amended Schedule J are disallowed, an additional $33,000 would be available over the Plan's commitment period for unsecured creditors. Or if these same expenses are disallowed in the amount deducted in part 43 of Form 22C, the additional sum would be $26,400.

The Debtors and the Trustee filed a joint Stipulation that pertains to the Debtors four vehicles, all of which they propose to retain under the Plan. They owe purchase money loans on the

4

Case 10-41855-JJR13    Doc 97    Filed 06/15/11    Entered 06/15/11 15:24:17    Desc Main
Document    Page 4 of 16

Cadillac and the Harley motorcycle; monthly Plan payments for the Cadillac are $242.40 and $191.15 for the motorcycle. They also own a Chevrolet Silverado and Honda Odyssey, both of which are paid for.[5] The Stipulation states that Mr. Hicks drives the Chevrolet and motorcycle, but prefers the motorcycle because it gets better gas mileage; Mrs. Hicks drives the Cadillac and her mother drives the Honda. According to the Stipulation "The debtors proffered that fuel for the . . . Chevrolet . . . when driven full time, is roughly equivalent to the payment on the Harley motorcycle."[6]

Recall that the Trustee's Motion complained that "Debtors are retaining unnecessary items (motorcycle)." In other words, retention of the motorcycle is not reasonably necessary for the Debtors to adjust and reorganize their debts under Chapter 13, for their performance of the Plan, or for their maintenance and support or that of their dependents. Hence, the Trustee argues that the motorcycle should be surrendered to its secured creditor pursuant to § 1325(a)(5)(C), thereby freeing-up an additional $191.15 per month for unsecured creditors ($11,469 over the life of the Plan). The Debtors respond that there would be little savings because the Mr. Hicks would then be required to drive the Chevrolet, and the additional fuel expenses would off-set any savings that resulted from the surrender of the motorcycle. The Debtors' response fails to address pertinent issues with respect to their retention of four vehicles.

Mr. Hicks' options for transportation include not only the motorcycle and Chevrolet, but also the Honda. The Honda is owned by the Debtors, not by Mrs. Hicks's mother, who allegedly drives

---

[5]The Chevrolet and Honda were claimed as exempt on the Debtors' Schedule C.

[6]It was not clear whether the Trustee intended to stipulate to the accuracy of this proffer, or merely agreed that such a proffer was made.

5

it. The Debtors have no obligation to furnish Mrs. Hicks's mother with a vehicle. The mother contributes no income to the family, and pays none of its expenses. A more credible proposal would be for Mrs. Hicks to drive the Honda and surrender the Cadillac, freeing up even more funds to pay unsecured claims. In any event, arguing that neither the motorcycle nor the Cadillac can be surrendered because the Honda is not available to the Debtors due to it being driven by a non-contributing, non-debtor-party, is in essence an argument that the unsecured creditors should pay for providing the mother with a vehicle. *See In re Napier,* No. Civ.A. 06-02464-JW, 2006 WL 4128358 (Bankr. D.S.C. Sept. 18, 2006) (deduction of expenses for live-in friend and her finance' disallowed). The solution is simple: One of the Debtors can drive the Honda, allowing the motorcycle or the Cadillac to be surrendered to its secured creditor, thereby increasing the payment to unsecured creditors by the amount of the monthly payments that otherwise would be paid for the surrendered vehicle.[7]

Because the Trustee objected to confirmation, the Court may not confirm the Plan unless all the Debtors' projected disposable income ("PDI") will be applied toward the payment of unsecured claims. § 1325(b)(1)(B). PDI is not defined in the Code; however § 1325(b)(2) does tell us how to determine the main ingredient of PDI: disposable income. Generally speaking, disposable income means a debtor's CMI — defined in § 101(10A) — less amounts reasonably necessary to be expended for the maintenance or support of a debtor and his dependents. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") created the means test to calculate

---

[7]Although not argued by the Trustee, both the motorcycle and the Cadillac could be surrendered, leaving each of the Debtors with a paid-for vehicle, and making an additional $26,000 available to unsecured creditors over the 5-year term of the Plan.

6

a debtor's CMI and ultimately his monthly disposable income.[8] Official Form 22C provides a step-by-step formula for this calculation.

The Debtors argue that because their Plan proposed to pay unsecured creditors at least the amount of their monthly disposable income as shown in Form 22C, they have satisfied their obligation under § 1325(b)(1) that requires all their PDI be paid to unsecured creditors. Part and parcel with this argument is their contention that the statutory means test incorporated in Form 22C for calculating monthly disposable income (Form 22C, line 59), permits the deduction of payments for all secured debts (Form 22C, line 47), regardless of what property will be paid-for and retained. Such an argument and contention are contrary the Code, and in particular Chapter 13.[9]

As mentioned earlier, under § 1325(b)(2) disposable income is determined by deducting from CMI "amounts reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor . . . ." Thus, if a proposed payment under a plan is for the retention of property that is not reasonably necessary for the maintenance or support of the debtor or his dependent, it may not be deducted when the determination is made regarding what sums should be

---

[8]Code §§ 1325(b)(3), 707(b)(2).

[9]The Debtors' argument requires an interpretation of § 1325(b) that leads to an absurd result. If their argument is adopted, then chapter 13 debtors my shield their post-petition income from unsecured creditors by reducing, or even eliminating their disposable income on the means test by deducting monthly plan payments for debts secured by Rolex watches, Mercedes automobiles, beach condos, and yes, even motorcycles — all beyond the pale of what is reasonably necessary for their maintenance and support. At the end of such a plan, the debtor will receive a discharge and fresh start that will be augmented by the equity allowed to accumulate by virtue of servicing these secured claims with monies that otherwise would be paid to unsecured creditors. Only above-median debtors could take advantage of these deductions since the means test is not consulted in calculating the amounts under-median debtors are required to pay. § 1325(b)(3). *In re Dew,* 344 B.R. 655 (Bankr. N.D. Ala. 2006).

7

Case 10-41855-JJR13    Doc 97    Filed 06/15/11    Entered 06/15/11 15:24:17    Desc Main
Document    Page 7 of 16

paid to unsecured creditors. *In re Cordle*, No. BK08-82332-TLS, 2009 WL 762184 (Bankr. D. Neb. Mar. 19, 2009) (confirmation denied due to proposed payment of claim secured by boat that was not reasonably necessary for maintenance or support of debtors) (citing *Coop v. Frederickson (In re Frederickson)*, 545 F.3d 652 (8th Cir. 2008)); *In re Namie,* 395 B.R. 594, 597 (Bankr. D.S.C. 2008) ("[T]hough . . . § 1325(b)(3) allows for the categorical deduction of certain actual expenses, those expenses must be 'reasonably necessary' regardless of whether Debtor is above the median income."). The Eighth Circuit in *Frederickson, supra*, recognized that the means test calculated under Form 22C was not the final say in determining a debtor's disposable income:

> Accordingly, we adopt the view shared by many bankruptcy courts that a debtor's "disposable income" calculation on Form 22C is a starting point for determining the debtor's "projected disposable income," but that the final calculation can take into consideration changes that have occurred in the debtor's financial circumstances as well as the debtor's actual income and expenses as reported on Schedules I and J.

545 F.3d at 659. Any question that the means test formula under Form 22C is sacrosanct was put to rest by the Supreme Court's recent decision in *Hamilton v. Lanning,* 130 S. Ct. 2464 (2011). The Supreme Court approved a deviation from the statutory formula for calculating disposable income by allowing consideration of income or expenses that are more realistic than those reflected by a strict application of the means test. "*Lanning* informs us that despite adoption of a uniform formula and many standardized expense amounts, the means test is not to be inflexibly applied. Instead, factual circumstances of each individual debtor are legally relevant."[10] Perhaps most significantly, the Debtors' proposal to retain four vehicles raises an issue under § 1325(a)(3), which prohibits the

---

[10]Mark A. Redmiles, *The Supreme Court Interprets the Means Test*, 30 Am. Bankr. Inst. J. 18 (Apr. 2011).

court from confirming a plan unless it "has been proposed in good faith."[11] The enactment of BAPCPA with its attendant means test did not abrogate § 1325(a)(3), and the deduction of an expense associated with a secured claim, although satisfying the mathematical function of the means test, does not insulate a proposed plan from further scrutiny for good faith. *In re Stitt*, 403 B.R. 694, 703 (Bankr. D. Idaho 2008) (subjective analysis of debtor's good faith mandated by § 1325(a)(3) even though debtor satisfied mechanical requirements of §1325(b)).

The court in *In re Predragovic*, No. 10-60259, 2010 WL 3239360 (Bankr. N.D. Ohio Aug. 16, 2010) denied confirmation of a plan that proposed to retain and pay for an extra vehicle — not unlike the Debtors' motorcycle, and arguably their Cadillac. The court stated that "[t]he allowance or disallowance of expenses on the means test is not determinative of good faith. Complying with the means test does not mean that any combination of expenses that leads to an equal or better financial number being paid to creditors is acceptable." *Id.* at *2.

In *In re Sandberg,* 433 B.R. 837 (Bankr. D. Kan. 2010) the bankruptcy court refused to confirm a plan that proposed for the debtor to retain a boat: "hardly anyone (at least in Kansas) 'needs' a recreational boat." *Id.* at 841. The *Sandberg* court concluded that:

> "[E]ven though the debtor may technically comply with the projected disposable income test of § 1325(b)(1)(B) and (b)(3) . . . [u]nder the . . . totality of circumstance

---

[11]According to the Debtors' proffered testimony, Mr. Hicks purchased the motorcycle, which was larger than his trade-in, so his daughter could ride with him to school. The Debtors' Schedules and the claims register (Claim No. 4) confirm that the motorcycle was purchased less than one year before the bankruptcy case was filed. The motorcycle's total price was $12,895; after a $4,657.85 down payment or trade-in, the balance of $8,237.15 was financed over 72 months at 15.99% interest. It should also be noted that the Debtors purchased and financed a 40" TV less than seven months before they filed bankruptcy. The motorcycle and TV were purchased, and related purchase-money debts incurred, when the Debtors owed their unsecured creditors over $160,000 (Doc. 4 Schedule F).

9

factors [adopted by the Tenth Circuit in *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir. 1983)], debtors' plan has not been proposed in good faith, notwithstanding the permitted deduction of the secured debt payment on the boat. . . . [T]he debtors' plan cannot be confirmed because it is 'fundamentally inappropriate' to permit the debtors to discharge so much unsecured debt while still retaining and enjoying a luxury item. Holding otherwise would defy the letter and spirit of chapter 13.

*Id.* at 848. Likewise, in *In re Martin*, 373 B.R. 731 (Bankr. D. Utah 2007) the court stated:

The Court's conclusion that the Debtors were entitled to account for the Ski Boat on Form B22C does not end its inquiry. To confirm a chapter 13 plan, the Court must find under 11 U.S.C. § 1325(a)(3) that the "plan has been proposed in good faith . . . ."
. . .
The bankruptcy system was designed to protect and benefit the "honest but unfortunate debtor." To that end, the totality of circumstances analysis has been described as a "smell test" intended to screen debtors who do not pass muster. It seems fundamentally inappropriate that a debtor might file for bankruptcy relief and obtain a discharge of [unsecured] debt while still enjoying a luxury item such as a recreational ski boat and trailer.

373 B.R. at 734, 735-736 (quoting *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007) (bankruptcy laws enacted to protect "honest but unfortunate" debtors).

The bankruptcy court in *In re Cordes*, 147 B.R. 498, 505 (Bankr. D. Minn. 1992), succinctly explained why the proposed payment of secured claims that will allow a debtor to retain unnecessary property smacks of bad faith:

[M]ore crucially, the debtor proposes to correspondingly defer, reduce, or even deny a return to other creditors on their prior claims, by diverting estate resources to nonessential purposes [i.e. debt service on Bayliner boat, motor and trailer]. This impermissibly tips the balance of bankruptcy relief far over to the debtor's side. Such a plan grants a windfall to the debtor, enriching him at creditors' expense to the extent of the equity accumulated post-petition. It does not meet the [good faith] requirement of § 1325(a)(3).

*See also In re Alston,* No. 07-02100, 2008 WL 3981811 (Bankr. E.D.N.C. Aug. 22, 2008) (confirmation denied where debtor proposed to keep expensive car); *In re Martin,* 373 B.R. 731

10

(Bankr. D. Utah 2007) (confirmation denied for lack of good faith due to debtor's proposed retention of ski boat).

The seminal decision by the Eleventh Circuit with regards to good faith in Chapter 13 plans, is *Kitchens v. Georgia Railroad Bank and Trust Co. (In re Kitchens),* 702 F.2d 885 (11th Cir. l983). The circuit court held that in determining a Chapter 13 debtor's good faith a bankruptcy court must consider, among other factors, the following:

(1) the amount of the debtor's income from all sources;

(2) the living expenses of the debtor and his dependents;

(3) the amount of attorney's fees;

(4) the probable or expected duration of the debtor's Chapter 13 plan;

(5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;

(6) the debtor's degree of effort;

(7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;

(8) special circumstances such as inordinate medical expense;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;

(10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors;

(11) the burden which the plan's administration would place on the trustee.

*Id.* at 888 - 89. The *Kitchens* court also added that "[a]ll but one of the circuits note that

11

substantiality of the repayment to the unsecured creditors should be one of the factors considered." *Id.* at 889. And in its conclusion affirming the district court's finding that a debtor's chapter 13 plan was not proposed in good faith, the Eleventh Circuit stated:

> Another factor noted by the Eight Circuit court is the accuracy of the plan's statements of debts and *expenses* and whether any inaccuracies are an attempt to mislead the court. *In re Estus,* 695 F.2d [311] at 317 [(8th Cir. 1982)]. Given the record's indication of the debtors' underestimation of income and overestimation of expenses, this factor calls for attention in the present case. The factors we have explicitly mentioned are not intended to comprise an exhaustive list, but they should aid bankruptcy courts as they determine whether debtors have proposed chapter 13 plans in good faith.

*Id.* (emphasis added).

Of the Eleventh Circuit's topics of inquiry pertinent to good faith, those listed in clauses (1), (2), (5), (6), (8) and (10), *supra*, as well as the substantiality of payment of unsecured creditors and accuracy of expenses, have particular application to the Debtors' Plan. The Debtors income is above the median, thus under BAPCPA Congress intended them to pay more to unsecured creditors than the minimum they could finesse by taking inflated and dubious deductions. The Debtors' were motivated to seek relief under chapter 13 not because they wished to pay a reasonable sum on their unsecured debts in return for a discharge and financial fresh start, but rather because their original petition seeking relief under Chapter 7 was found to be an abuse — they converted their case to Chapter 13 to avoid dismissal. The Debtors' have demonstrated that although they have the means to do so, they have no desire to make a substantial payment to their unsecured creditors. They can pay considerably more than the 10% they propose under their Plan, but have refused to further amend their Plan to provide for a greater sum to unsecured creditors. As discussed above, they could surrender their motorcycle or Cadillac, or both, thereby making available substantial additional funds

12

for unsecured creditors, and two paid-for vehicles will be retained for the two bread-winners in the family.

Like the Chapter 13 case being scrutinized by the Eighth Circuit in *Estus*, *supra*, the Debtors' overestimation of expenses also calls for further examination. The Debtors' expenses reported in Original and Amended Schedules J were larded with monthly payments for a security system and cable. Such may be conveniences, but their related expenses cannot be justified as reasonably necessary for maintenance or support, and should be devoted to unsecured creditors. The Debtors' expenses also included vehicle tags and auto insurance totaling $4,500 per year ($22,500 over the term of the Plan), a substantial portion of which was obviously attributed to their proposal to retain four vehicles. More significant was the Debtors' attempt to deduct extra classroom expenses, first for non-dependent students in their classrooms, and then for their own children; however, in neither instance did the Debtors substantiate the legitimacy or accuracy of these expenses as required by official Form 22C and § 707(b)(2)(A)(ii)(IV).

Finally, the lack of special circumstances, rather than their existence, is noteworthy. After reviewing the Debtors' Schedules and Statement of Financial Affairs, it becomes clear that the impetus behind the Debtors' seeking bankruptcy relief was not the imminent foreclosure of their home (they reported no mortgage arrears), loss of employment (they have both had the same employer for 5 years, Schedule I, Doc. 4), garnishment of wages or bank accounts (none were reported in Statement of Financial Affairs, Doc. 5), or excessive medical bills, divorce, incarceration or other tribulations that often leave debtors with no alternative but to seek bankruptcy relief. Rather, the Debtors' financial distress was the result of their imprudent and excessive use of credit;

their schedules reflect debts for twelve credit cards, a motorcycle and a big screen TV— the latter two debts having been incurred within one year of the petition date and at a time when the Debtors were indebted for a student loan exceeding $122,000.00. (Schedule F, Doc. 4).[12]

In summary, the Debtors' Plan should not be confirmed. The Debtors have intentionally skewed their disposable income by deducting excessive and unsubstantiated expenses from their CMI. In that same vein, they have insisted on paying for two vehicles when they have two others that are fully paid for. Under the totality of the circumstances, and after applying the *Kitchens* factors, the Court concludes the Plan was not proposed in good faith — a requirement for confirmation. And without any explanation or attempt at pretense, the Debtors ignored the unequivocal requirement imposed by §1326(a)(1(C) that chapter 13 debtors pay adequate protection payments to purchase money secured creditors pending plan confirmation.

Debtors' counsel informed the Court that the Debtors did not intend to further amend or substitute their Plan, and thereby make a further effort to achieve confirmation. Thus, this case will be dismissed pursuant to § 1307(c)(1), (4) and (5).[13]

At the end of the confirmation hearing, Debtors' counsel informed the Court that if the Trustee's Motion was granted, the Debtors intended to appeal. Counsel made an oral motion on the record for the Court to stay its order pending appeal. Stays pending appeal of a bankruptcy court's

---

[12] In this district, many debtors seek relief because of unforeseen and unavoidable circumstances — job loss, illness, domestic problems — but just as many file bankruptcy simply because they incurred excessive debt and lived beyond their means. The Debtors' circumstances indicate the latter and not the former was the basis for their petition.

[13] This case has been pending for almost one year without plan confirmation; no adequate protection payments are being made to secured creditors; confirmation is being denied, and no request was made to file another plan or modify the Plan; dismissal is the only alternative.

judgment or order in a contested matter are governed by Rule 8005 of the Federal Rules of Bankruptcy Procedure. In pertinent part that Rule provides that "the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code, or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest."

The law for granting or denying a stay pending appeal is the same as for granting a preliminary injunction.[14] The following are the four factors that should be considered in determining whether a stay should be granted:

1. Whether the movant has shown a likelihood of success on the merits;

2. Whether the movant has made a showing of irreparable injury if the stay is not granted;

3. Whether the granting of the stay would substantially harm the other parties; and

4. Whether the granting the stay would serve the public interest.[15]

The Debtors have failed to satisfy any of the four factors that would support staying dismissal of their case. As discussed at length in this Opinion, the Debtors' Plan is deficient on several fronts, and it is difficult for this Court to anticipate any grounds on which an appellate court will find the Plan worthy of confirmation. If a stay is not granted, then the Debtors will lose the protection of the automatic stay under § 362(a) which they have enjoyed for almost one year. Without automatic stay protection, secured creditors may repossess the Debtors' motorcycle and Cadillac, but the Debtors

---

[14]*In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294 (7th Cir. 1997).

[15]*In re Gulf States Steel, Inc.*, 285 B.R. 739, 741 (Bankr. N.D. Ala. 2002).

15

will retain their two unencumbered vehicles.  The Debtors are not making payments to their secured creditors — other than their mortgage which is not being paid through the Trustee —  but they continue to enjoy the use of the motorcycle, Cadillac and 40" TV.  Creditors have been held at bay without receiving any compensation for almost one year; harm to creditors by staying the dismissal and thus leaving the automatic stay in place outweighs harm to the Debtors.  No public interest would be served by either granting or denying a stay on appeal.  Accordingly, the Debtors' motion seeking a stay pending appeal is due to be denied.

     An order in conformity with this Opinion will be entered pursuant to Rule 9021 of the Federal Rules of Bankruptcy Procedure.

Dated:  June 15, 2011

                                              /s/ James J. Robinson
                                              JAMES J. ROBINSON
                                              United States Bankruptcy Judge